

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. * <br> Shelley Roman <br> * <br> Plaintiffs, * <br> * <br> v. * <br> * <br> ALL STATE CAREER, INC. * <br> 2200 Broening Highway – Suite 160 * <br> Baltimore, Maryland 21224 * <br> * <br> & * <br> * <br> * <br> * <br> EDUCATION AFFILIATES, INC. * <br> 5024-A CAMPBELL BLVD * <br> Baltimore, Maryland 21236 * <br> * <br> Defendants * | CIVIL FALSE CLAIMS ACT <br> COMPLAINT, WITH REQUEST FOR <br> JURY TRIAL <br><br> FILED IN CAMERA <br> AND UNDER SEAL PURSUANT TO <br>   31 U.S.C. § 3730(b)(2) <br><br> DO NOT ENTER IN PUBLIC PACER <br> DO NOT PLACE IN PRESS BOX <br><br> CIVIL ACTION NUMBER: _____ <br><br> CCB 10 CV 1730 |

*********************************************************************

## FALSE CLAIMS ACT COMPLAINT

### INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims approved and presented by Defendants to obtain millions of dollars annually from the United States Department of Education pursuant to the Higher Education Act, Title IV ("HEA"), from at least July 2006, continually through the present.

2. Defendant All State Career is a large recipient of HEA federal student financial aid funds from the United States Department of Education.

3. Defendant Education Affiliates is the owner of All State Career and is also a large recipient of federal funds.

4. In requesting and receiving millions of dollars annually, Defendants falsely represent every year that they are in compliance with HEA's prohibition against using incentive payments for recruiters for recruiting activities, which is a core prerequisite to eligibility for the Title IV funds.

5. Defendants had, and continue to have, actual knowledge that they are not adhering to the HEA ban, that their representations of adherence were and are false, and that they therefore were and are submitting false or fraudulent representations of compliance.

6. Alternatively, Defendants act and acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims.

7. Relator asserts causes of action under the False Claims Act for submission of a knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1) and (2).

**JURISDICTION & VENUE**

8. This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq., and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331.

9. This case arises from the wrongful conduct of the Defendants incident to obtaining funds from the United States of Department of Education pursuant to the Higher Education Act, Title IV.

10. This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

11. 31 U.S.C. § 3732(a) provides "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in which any proscribed by section 3729 occurred."

12. Venue is proper in the District of Maryland because Defendants maintain and operates a campus within this District.

<u>The Relator & The Plaintiff</u>

13. Qui Tam Relator Shelly Roman (hereinafter "Relator") is a citizen of the United States of America and is a resident Anne Arundel County, in the State of Maryland.

14. Relator worked for Defendants from July 2006 until March 2010.

15. Relator worked for the Defendants first as an admissions representative and then as a senior admissions representative. In 2009, Relator was promoted to Assistant Director of Admissions. Plaintiff "skipped over" the master admissions representative when she was promote from senior admissions representative to assistant admissions director.

16. Relator was terminated from Defendants' employment after she complained of the inappropriate conduct of the Admissions Director, Jeff Curry.

17. Relator brings this action on behalf of the United States of America.

18. As required under the False Claims Act, 31 U.S.C. § 3730(a)(2), Relator simultaneously with the filing of this Complaint, provided to the United States Attorney for the District of Maryland a statement of all material evidence and information related to this Complaint.

19. This disclosure statement supports the existence of "submission of a knowingly false or fraudulent claim for payment or approval," under the False Claims Act (31 U.S.C. § 3729(a)(1)).

20. The United States of America is here named the Plaintiff because funds of the United States of America ("Federal funds") were and are awarded to Defendants, pursuant to the HEA, Title IV, as a result of the false claims alleged in this Complaint.

### DEFENDANTS

21. Defendants are large private, for-profit higher education companies that contend that they be provide educational programs for adult students.

22. Defendant All State Career maintains four campuses in Maryland and Pennsylvania.

23. Defendant Education Affiliates has more than 15 campuses, not including its All State Career School.

24. The terms "Defendants" will refer collectively to the aforesaid Defendants acting by and through their managerial employees, and each of them.

25. Managerial employees of the Defendants, in doing the acts and things described in this complaint, were acting within the course and scope of their respective agencies and/or employment with the Defendants, and each of them, with the knowledge and consent of the Defendants, and each of them, unless otherwise indicated.

26. At all relevant times each Defendant was the authorized agent of each other Defendant.

27. Education Affiliates controls and dominates the affairs and operation of All State Career School.

## SUMMARY OF THE LAW & THE FRAUD INVOLVING FEDERAL FUNDS

28. HEA, Title IV, prohibits colleges and universities from providing "any commission, bonus or other incentive payment . . ." to recruiters based on recruiting activities. HEA, sections. 487(a) and 487(a)(20).

29. The statutory ban was enacted 1992 amid reports of numerous institutions enrolling unqualified students, just to receive the federal student-aid funds from the United States Government.

30. The statutory incentive compensation ban is a core prerequisite for an educational institution's eligibility to request and receive Title IV funds.

31. The United States Government awards billions of dollars a year to help students obtain their educations at colleges and vocational schools.

32. The federal funds, however, do not go to the students.

33. Instead, the educational institution requests the funds of the United States Department of Education or a third party intermediary lender.

34. The United States Government or the lender wires the funds directly into the institutions' accounts.

35. The institutions then credit their students for tuition.

36. Students are responsible for paying back the United States Government once they graduate or stop attending the university.

37. Students disqualified from a university must still repay the federal loans.

38. These students, unable to complete their education and obtain a decent paying job to repay their federal loans, are forced into dire financial situations.

39. The institutions, meanwhile, retain the fraudulently obtained federal funds.

40. The Defendants, in flagrant violation of the Title IV ban, compensate admissions representatives, including Relator, based directly upon enrollment activities.

41. The Relator's superiors repeatedly told Relator and other admissions representatives that they controlled how much money they would earn by the number of students they enrolled.

42. The Relator's superiors repeatedly Relator and other admission representatives that they could either make a lot of money or not a lot determined by how many students they enrolled.

43. Compensation and advancement opportunities for admissions representatives at All State Career was all driven by sales numbers – enrolling individuals and ensuring that they showed up for the first day of classes.

44. Admission representatives received what management openly called "commissions", but in writing were labeled as "graduation" bonuses. Admission representatives were paid a commission for each person that they enlisted at the school, even though they had absolutely no involvement in their education or job placement efforts.

45. Admission representatives were promoted on the basis of their sales "numbers".

46. Admissions representatives were eligible for salary increases approximately every seven months, if their enrollments and starts were satisfactory. If admission representatives' numbers were not satisfactory, their salary never increased and they were not promoted.

47. All State Career did have an evaluation process that, on paper, had quantitative and qualitative components. However, the qualitative components were, in reality, meaningless and included items such as attendance and punctuality. But really, only the numbers mattered– the quantitative component of the evaluation.

48. Great pressure was placed on admissions representatives to sale All State Career School to prospective students. They were told that if they wanted to get paid they had to have the numbers and reach/surpass the objectives.

49. Mr. Curry, in the presence of the Relator, often stated outright that all that matter was selling the school and get students to enroll.

50. The Defendant All State Career never provided any training to the admissions staff on the purpose or mission of vocational schools, as set by the federal government for federal financial aid purposes.

51. The premise of all training sessions was how to improve sales numbers and converting "leads," enrolling students that actually start. Product knowledge training was only given on a one time basis. The only thing that mattered to Admissions was enrolling and starting students regardless of whether or not the program suited them or whether or not they could be successful in obtaining a job in the field of choice, As stated by management, admission reps simply had to "get their asses in classes."

52. The top ranking representatives are among the highest paid admission reps, receiving the highest salary as well as incentive trips and paid days off.

53. To boost its enrollment numbers, Defendants urge admission representatives to enroll students without reviewing their transcripts to determine their academic qualifications to attend the university.

54. This process leads to student disqualification from Defendants (or additional financial costs for the students to take additional classes) and financial disaster for the students forced to repay the federal loans while Defendants collect the federal funds for these fraudulently "enrolled" students.

55. Defendants are fully aware of the illegality of its compensation scheme.

**DEFENDANTS' FALSE CERTIFICATIONS TO THE FEDERAL GOVERNMENT**

56. Educational institutions request Title IV funds for eligible students through several programs, including the Federal Pell Grant Program ("Pell"), the Federal Supplemental Educational Opportunity Grant Program ("FSEOG"), the Federal Perkins Loan Program ("Perkins") and the Federal Family Education Loan Program ("FFELP").

57. For an educational institution to be eligible to receive these Title IV grant funds, the federal statutes and regulations require the institution to certify to the United States Government that the institution will comply with the incentive compensation ban through a Program Participation Agreement ("Agreement"). HEA, Sec. 487(a) and (a)(20); 34 C.F.R. Sec. 668.14(a)(1) and (b)(22)). This certification is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

58. An educational institution is ineligible to receive Title IV funds without the Agreement certification of compliance with the incentive compensation ban.

59. The Agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program.

60. The Agreement expressly states, in bold print, highlighted in a box on the first page: "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."

61. The Agreement's first paragraph furthermore provides that the institution's participation in the Title IV program is "subject to the terms and conditions of this Agreement."

62. One of the "terms and conditions" of the Agreement is the incentive compensation ban.

63. In the Agreement, the educational institution certifies that "[i]t will not provide . . . any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments . . . (Agreement, p. 5, para. 22, quoting directly from the HEA, Sec. 487(a)(2) and the federal regulations, 34 C.F.R. Sec. 668.14(b)(22)).

64. Educational institutions violating the incentive compensation ban must return the Title IV funds, along with interest and special costs incurred by the DOE.

65. Defendants, in requesting and receiving a huge amount of Title IV funds, every year falsely certify to the DOE compliance with the incentive compensation ban in the Agreement it submits annually to the DOE.

66. Defendants falsely induce the Government to approve and/or pay out the Title IV funds, based on its false promises to comply with the incentive compensation ban.

67. The promises when made are false.

68. Upon making its promises and certifications, Defendants knowingly engage in the illegal incentive compensation schemes detailed below.

69. Defendants every year also falsely assert compliance with the incentive compensation ban in "management assertion letters" written by management for an annual compliance audit.

70. Defendants must submit to the United States Government this annual compliance audit performed by an independent certified public accountant.

71. Participation in the Title IV program is conditioned upon Defendants submitting these audits certifying compliance with the HEA incentive compensation ban.

72. Defendants are ineligible to submit any claims for HEA funds unless they submit the annual audit.

73. As a required part of the audit, the Defendants certify in a management assertion letter that it had "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . for each year at issue."

74. Defendants know this certification is false because Defendants intentionally violates the incentive compensation ban.

75. Upon entering the Program Participation Agreement with the United States Secretary of Education, Defendants are eligible to request the Title IV funds from the United States Secretary of Education (for Pell Grant funds) or from third party lenders (for government-insured loans).

76. For Pell Grant funds, Defendants submit a request for those funds directly to the Secretary of the United States Department of Education.

77. The request for funds is not a student application but a request prepared and transmitted by Defendants to the Secretary of the United States Department of Education, stating the requested amount of funds.

78. The United States Department of Education transfers the Pell Grant funds electronically directly into Defendants' account.

79. Upon receiving the Pell Grant funds, Defendants credits various students for tuition paid.

80. A student does not request or receive any amount of the Pell Grant funds.

81. Defendants' claims for the Pell Grant funds are fraudulent.

82. When Defendants request, receive and retain the Pell Grant funds, they know they are ineligible for those funds because of its intentional violations of the Higher Education Act incentive compensation ban.

83. For government-insured loans, including the FFELP, Defendants submit the request for those funds directly to a private lender.

84. The Defendants' request for government-insured loan funds, arranged, managed and prepared by Defendants, includes a student application that contains an express certification by Defendants that the student is an eligible student under the Title IV program.

85. The claim for government-insured loans must include this certification.

86. Defendants know that this claim for funds is false because they know students are not eligible under the Title IV program due to their violations of the HEA incentive compensation ban.

87. Only students at eligible Title IV schools may receive credit for Title IV government-insured loan funds disbursed by private lenders to educational institutions.

88. Defendants' fraudulent violations of the HEA incentive compensation ban make it an ineligible educational institution to request and disburse Title IV funds, and thus its students are ineligible under the Title IV program. Defendants' claims for the government-insured loan funds are fraudulent.

89. When Defendants request, receive and retain the government-insured loan funds, they know they are ineligible for those funds because of its intentional violations of the Higher Education Act incentive compensation ban.

90. Defendants know that compliance with the Higher Education Act funding statute incentive compensation restriction is a core prerequisite for an institution's eligibility to request and receive Title IV funds

91. The United States Government pays all interest on the government-insured loans while the students are enrolled in classes and during authorized grace periods.

92. The loans are guaranteed by state agencies or non-profit organizations (called "guarantee agencies"), and are subsidized and reinsured by the United States Department of Education.

93. Defendants' admission reps' compensation, including salary, is based upon the number of students they enroll and who start school.

94. The compensation scheme for admissions staff is developed, implemented and directed by Defendant Education Affiliates.

95. Defendants meticulously tracks each admission rep's activities on a daily, weekly, monthly, quarterly and annual basis.

96. Defendant All State Career posts and submits to each admissions representatives their "numbers."

97. Admission representatives submit daily and weekly enrollment activity levels.

98. Relator was one of the top performing admissions representatives.

### ADMISSION REPS ARE REWARDED WITH TRIPS & PAID TIME OFF

99. In addition to salary, Defendants also illegally compensate admission representatives based upon enrollments and enrollment activities through trips and paid time off.

100. The Defendants offer their top selling admissions representatives a free trip each year to a resort. Relator was rewarded for her sales and received yearly trips. For example, Relator went to Puerto Rico, Las Vegas, and St. Thomas with the Defendants' top executives. Those who were rewarded with the trips were members of the so-called

"Circle of Excellence". Officials from Education Affiliates went on the trips and "schmoozed" with the winning admissions representatives.

101. The "reward/incentive" trips treated the top-selling admission reps. with extravagant excursions, meals and other activities.

102. Additionally, the top selling admissions representatives were awarded with paid days off. The Admissions Director, Jeff Curry, in team meetings, would identify those top-sellers and tell them that could take a paid day off and openly instructed that when they did, if asked where they were, they should just say on company business.

103. Mr. Curry, and his superior, Will Bowker, the Executive Director of the School, informed admission representatives that could earn free dinners and limousine rides if their numbers were impressive.

### LOW ENROLLMENT NUMBERS LEADS TO EMPLOYMENT TERMINATION

104. Defendants place admission representatives failing to reach acceptable enrollment activity levels on a "performance improvement plan" setting forth minimum enrollment activity goals.

105. Unsuccessful completion of a "performance plan" leads to termination of the representative's employment. However, often times, Mr. Curry makes their job so difficult that the representatives quit their jobs.

### DEFENDANTS' PRESSURE TO ENROLL STUDENTS WHO COULD NOT QUALIFY – "THE FIX"

106. Every work day at 2:00 p.m., the Defendant All State Career's Director of Admissions, Jeff Curry, held mandatory "sales" meetings called "scrubs" where representatives were required to disclose and report on the number of their enrollees and starts.

107. Mr. Bowker also occasionally attended these daily meetings, usually as a passive observer.

108. During the "scrubs", Mr. Curry regularly berated and threatened the admission representatives if they did not meet their numbers, if they did not "fix things" to get an enrollee to start if the enrollee had some eligibility issue.

109. On at least one occasion, Mr. Curry made a representative cry because her numbers were satisfactory, and he threatened her with termination if she did not improve and getting more enrollees.

110. During these meetings, Mr. Curry repeatedly threatened that if they wanted their salary they had to do whatever was necessary to get their numbers up.

111. Mr. Curry repeatedly told representatives to do whatever was necessary to get a new student signed up. He frequently made comments like "you know what you need to do if you want a salary increase" and "fix the problem."

112. Mr. Curry, in his office, had three white-boards that tracked all of the enrollment numbers and student start numbers by each individual admission rep. and with totals per day, per month and per program.

113. More often than not, Mr. Curry used profanity during the "scrub-ins." Relator, as the Assistant Director of Admissions and a senior representative, often was present when Mr. Curry would tell the representatives that "it is all about your numbers".

114. The term "graduation bonus" was almost never used in the "scrubs." All incentive compensation was called "commissions."

115. Also, oftentimes to avoid firing a representative who has low numbers, Mr. Curry publicly humiliated the representative to force him/her to quit.

116. Admissions representatives, to continue to get paid and paid more did, in fact, "fix" problems and do "whatever is necessary" to get enrollees and starts.

117. The "fixing" that was done, included and was not limited to: (a) forging high school diplomas; (b) forging United States Department of Transportation documents; (c) and falsifying enrollees' application background materials. If this "rampant" fixing did not occur, the students would not eligible for the federal funded and financed education and training.

118. Moreover, admissions representatives were able to ensure that enrollees whom otherwise would have failed a drug test, passed, by having someone on "the inside" at the testing facility make sure that the results came back negative.

119. Additionally, to "fix a problem" and doing whatever was necessary in order to entice, and to recruit, and to increase their sales numbers, representatives obtained answers to the Ability-to-Benefit tests and distributed copies of the answers to testing students.

120. The Ability-to-Benefit test is required of students seeking federal financial aid who did not graduate from high school in the United States. To this end, these students must demonstrate they possess sufficient "ability to benefit" (ATB) from post-secondary education via their performance in an approved test. If they do not, then they and the enrolling company cannot get federal financial aid.

121. Students for the allied health program were supposed to pass a "12 minute" "Wonderlic" assessment to attend the school. The majority of the allied health students did not pass the Wonderlic assessment. As a result therefore, either the admission reps assigned to the allied health program or the front desk receptionists would erase the

wrong answers and make them right. Other times the allied health admission reps took the assessment for the students to get them in school

122. The "fix" also included instructing students how to apply for and get the most financial aid for themselves and the Defendants.

123. Admission representatives created false tax statements for students and made up dependents for enrollees to increase the amount of their financial aid.

124. But for the fabrication of federal documents and submitting false information to the federal government, Defendants enrolled students, whom otherwise would not qualify, obtained much federal funds.

125. Defendants never audited or inspected the work of admissions representatives to ensure regulatory compliance and never offered regulatory training to admissions representatives.

## CONCEALMENT OF THE "FIX"

126. In 2009, an accreditation agency came to inspect All State Career's Baltimore campus. In preparation for the on-site accreditation inspection, admissions representatives received training over several weeks about how to deal with the accreditation officials.

127. This training was mandatory and a corporate official from Education Affiliates, the head of compliance, participated in telling the admission representatives what to do and say.

128. The admissions representatives were ordered: (a) to avoid the accreditation officials altogether and as much as possible; (b) if asked a question by such an official to direct that person to upper management; (c) to not disclose that they received any sort of

commission or even a graduation bonus; (d) to not discuss the "numbers" they were required to meet; (e) to not talk about the daily "scrub" meetings; and (f) to not report on the great efforts taken to enroll students that otherwise would not be eligible to receive federal financial assistance.

129. In preparation of the meetings, admissions representatives were order to remove from their offices and desk areas any documentation regarding the "numbers", compensation and marketing materials that All State Career used to lure and induce students.

## THE FRAUD EXTENDING TO CAREER PLACEMENT

130. Upon information and belief, Defendants were required to report on the job placement results to the U.S. Department of Education.

131. The Director of Career Services for All State Career was required to sign-off/approve each enrollment application, indicating the enrollee had the ability to benefit from the applied-for education/training.

132. The Director certified enrollees whom did not have the ability to benefit and whom were in reality not eligible for federal financial assistance.

133. Oftentimes, Mr. Curry as well as admission representatives, pleaded with the Career Services Director to sign-off on enrollees with very suspect credentials.

134. The Career Services Director routinely approved such enrollees and bargained with the admissions staff to find her some placement numbers by contacting former students.

135. For several years, the Director of Career Services, exaggerated the numbers the job placement of the Defendant's students.

136.     Prospective students and enrollees were not presented an accurate and complete assessment of their job opportunities by the Defendants.

## VIOLATIONS OF LAW

I. **KNOWINGLY FALSE STATEMENTS TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED, IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.SC. § 3729(A)(1)**

137.     Plaintiffs re-allege, and fully incorporate herein by reference all paragraphs set forth in this Complaint.

138.     In performing all of the acts set out herein, Defendants defrauded the United States of America by knowingly presenting, or causing to be presented, to one or more officers, employees or agents of the United States of America, a false and fraudulent claim for payment or approval, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(3)), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.

II. **KNOWINGLY FALSE RECORDS OR STATEMENTS TO GET A FALSE OR FRAUDULENT CLAIM PAID OR APPROVED, IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. §3729(A)(2)**

139.     Plaintiffs re-allege, and fully incorporate herein by reference all paragraphs set forth in this Complaint.

140.     By virtue of the acts described above, Defendants have knowingly made, used or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States of America, in contravention of the False Claims Act (31 U.S.C. § 3729(a)(2)), to the damage of the treasury of the United States of America, by causing it to pay out money it was not obligated to pay.

### III. REQUESTED RELIEF

WHEREFORE, Plaintiffs request the following relief:

1. Judgment in favor of the United States of America against Defendants, jointly and severally, by reason of the violations of the False Claims Act as set forth above, in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Dollars ($5,500.00), and not more than Ten Thousand Dollars ($11,000.00), for each violation, plus three times the amount of damages which the United States Government has sustained, pursuant to 31 U.S.C. § 3729(a);

2. Award to Relators, as the Qui Tam plaintiffs, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act on the United States' recovery;

3. Award to Relator of all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs; and

4. Such other and further relief as the Court deems proper.

## Jury Demand

Pursuant to Fed. R. Civ. P. 38 (b), Relator, on her own behalf and on behalf of the United States, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ _____

Stephen B. Lebau
LEBAU & NEUWORTH, LLC
606 Baltimore Avenue – Suite 201
Baltimore, Maryland 21204
tel. 410.296.3030
fax. 410.296.8660
Attorney for Relator

## Certificate of Service

I hereby certify that a copy of the Complaint in this matter was served on the following individuals by First Class, Certified, U.S. Mail, postage paid on this 28th day of June 2010:

Eric Holder, Esquire
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Rod J. Rosenstein, Esquire
U.S. Attorney
District of Maryland
36 S. Charles Street 4th Fl.
Baltimore, MD 21201

_____
Stephen B. Lebau